UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| T.Z., by and through his parent and legal guardian, P.Z., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Cause No. 4:22-CV-016-PPS-JEM |
| TIPPECANOE SCHOOL CORPORATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

Plaintiff T.Z. is a child with special needs who alleges he was abused and discriminated against at his school when his teachers repeatedly locked him in a small, windowless closet as a form of punishment. A sprawling complaint followed, alleging a bevy of constitutional and tort claims against the Tippecanoe School Corporation and any individual who was in any way associated with the decision to treat T.Z. in such a manner. [DE 1.] The action is being prosecuted by T.Z.'s guardian, P.Z. The defendants have all answered but now seek judgment on the pleadings. [DE 24; *see also* DE 23; DE 25; DE 36; DE 37.] For the following reasons, almost all of the claims will survive dismissal with the exception of a couple that fail to state a claim. As a result, the motions will be granted in part and denied in part.

**Facts**

T.Z. is an eleven-year-old who has been diagnosed with anxiety disorder, unspecified trauma and stressor-related disorder, severe articulation disorder, and

moderate expressive disorder. [DE 1, ¶¶ 1–2, 35–37.] Since T.Z. started kindergarten in 2016, he has attended schools operated by Tippecanoe School Corporation, including Dayton Elementary School, Wea Ridge Elementary School, and Woodland Elementary School. *Id.*, ¶¶ 3–4, 39–41, 86. Between kindergarten and fourth grade, T.Z. was placed in self-contained classrooms for students with emotional disabilities. T.Z. was also provided an individualized education plan (IEP) that took account of his disabilities. *Id.*, ¶¶ 39–41, 43.

As explained in greater detail below, if one believes the complaint, this case arises from a disturbing pattern of discrimination and mistreatment involving T.Z.'s improper seclusion, on over 100 occasions, in a "small, barren, unfurnished closet with no outside windows and a hard tile floor" while he was a student at Wea Elementary. *Id.*, ¶¶ 46, 50. As a result of this mistreatment, T.Z. has sued everyone in sight. He asserts *fourteen* causes of action against twelve defendants. As is often the case with a blunderbuss of a complaint, it is hard to tell the players without a scorecard. *Id.* at 18–30. So, to set the stage, I'll start by summarizing the defendants and their roles in the school system. The first set of defendants are the entities: Tippecanoe School Corporation and Greater Lafayette Area Special Services (GLASS), the special education cooperative responsible for the direct provision of special education and related services to students within the district. *Id.*, ¶¶ 5–6.

The other ten defendants—the so-called "individual defendants," *id.*, ¶ 25 – fall into two groups. First are the three officials responsible for overseeing the development

of IEPs as well as the implementation of the district's policy on student seclusion: Dr. Scott Hanback, the district's Superintendent (and a GLASS advisory board member); Kelly Gabauer, the district's Director of Special Education (also a GLASS advisory board member); and Lesley Dause, the "GLASS Specialist" employed by the district and assigned to Wea Elementary. [DE 1, ¶¶ 7–11.] Plaintiffs assert that in conjunction with GLASS, Hanback, Kelly Gabauer, and Dause were responsible for training the district's employees on the student seclusion policy, including the use of "de-escalation techniques, redirection, and the proper and legal use of seclusion." *Id.*, ¶ 23.

The second group of defendants named in their individual capacities are various employees (or former employees) at Wea Elementary, including Michael Gabauer, the school's former Principal; Clint Wilson, the Principal starting in the 2020–2021 school year; Jeffrey Toll, the former Assistant Principal; Courtlon Peters, the Assistant Principal; Kelly Vanderwal, T.Z.'s special education teacher; and Marrissa Parker and Ashley Achgill, two aides in Vanderwal's classroom. *Id.*, ¶¶ 13–19. Vanderwal, Michael Gabauer, Dause, Peters, and Wilson attended meetings concerning T.Z.'s IEP and participated in its development. *Id.*, ¶ 20. In the classroom, Vanderwal, Achgill, and Parker exercised control over T.Z. and were directly responsible for monitoring and reporting his behavior. *Id.*, ¶ 24. The school's Principals and Vice Principals, along with Hanback, Kelly Gabauer, and Dause, were responsible for ensuring that special education staff followed the district's policies on student seclusion. *Id.*, ¶ 22.

3

T.Z. faces a number of mental health and emotional challenges. He requires a structured environment, does not easily adapt to changes or transitions, clings to adults with whom he feels comfortable, can become easily frustrated and overwhelmed, and can exhibit aggression and disruptive behavior. [DE 1, ¶¶ 37–38.] In 2016, based on his behavior in kindergarten, T.Z. was transferred to a self-contained classroom at Dayton Elementary School for students with behavioral disabilities. *Id.*, ¶¶ 39–40. The next school year, he was transferred to an emotional disability classroom at Wea Elementary. *Id.*, ¶ 41. He remained enrolled there during his first through fourth grade years, until September 2020. *Id.*

While enrolled at Wea Elementary, T.Z. was allegedly subjected "to various forms of neglect, social isolation, psychological, and physical abuse" due to school employees' improper application of the district's "Seclusion Plan." *Id.*, ¶¶ 42–51. As part of T.Z.'s IEP, he could be placed in "time-out." P.Z. understood "time-out" to mean "time out as a parent would use at home," or how the term is "defined legally," that is: "a behavior reduction procedure in which access to reinforcement is withdrawn for a certain period of time." *Id.*, ¶¶ 43–45. Separate and apart from the IEP, the district had a Seclusion Plan applicable to all students. It states that students may be secluded only when "displaying behavior that presents an imminent risk of injury to the student or others" and "after a less restrictive procedure has been implemented without success." *Id.*, ¶ 51.

T.Z. claims that, in practice, school employees improperly secluded him from the classroom environment in violation of the district's policy. [DE 1, ¶¶ 44, 46–47.] On over

100 instances, school employees allegedly put T.Z. in a seclusion room—"a small, barren, unfurnished closet with no outside windows and a hard tile floor"—and "placed a curtain over the window," which prevented T.Z. from seeing out and staff from visually monitoring him in the room. *Id.*, ¶¶ 46–47, 50. He was "regularly forced into and held" in the room by his special education teacher and teacher aides—"often for extended periods, as someone held the door shut from the outside"—even though his behavior did not present a threat to himself or others. *Id.*, ¶¶ 48, 52. Rather than secluding T.Z. for a proper purpose, his teachers allegedly used seclusion "for punishment and other improper purposes," such as when they were frustrated with his behavior or "angry with him." *Id.*, ¶¶ 52–53. Rather than using "conflict de-escalation, positive reinforcement, or redirecting attempts"—which Plaintiffs claim are "appropriate scientifically proven interventions"—Vanderwal, Achgill, and Parker instead opted to "[take] out their frustration and anger on T.Z." *Id.*, ¶¶ 97–98. T.Z. was secluded for many benign reasons like "rude language," "arguing," "not following directions," "talking out," "not working," "crying," and "being disrespectful and rude to teachers"—none of which implied an "imminent risk of injury to [T.Z.] or others," as required by the Seclusion Plan. *Id.*, ¶¶ 51, 53–56.

T.Z.'s IEP stated that "time-out" would last "for 5 minutes." Under the Seclusion Plan, an appropriate period of seclusion was supposed to last only for a "short period of time" and be discontinued when a "student is no longer an imminent threat to others." *Id.*, ¶¶ 58, 63. However, school records reflect that on at least some instances, T.Z. would

be secluded for long or indeterminate periods of time, sometimes for the better part of an hour. [DE 1 at ¶ 59.] The school employees also "demanded [T.Z.'s] compliance with a timer." Plaintiffs assert that the use of a timer facially violated the Seclusion Plan, since the policy disallows seclusion when a student no longer poses an imminent threat to others. *Id.*, ¶¶ 63–64.

The school's practices also allegedly violated the Seclusion Plan in several other ways. T.Z. was rarely "debriefed" after seclusion incidents. The school and its employees also failed to "use de-escalation techniques," properly document each instance of seclusion, promptly contact T.Z.'s parents "as soon as possible" with seclusion reports, notify the Indiana Department of Education regarding the number of seclusions taking place in the school district, and maintain "direct continuous visual and auditory monitoring" of T.Z. (due to the curtain placed over the seclusion room). *Id.*, ¶¶ 65–68, 71–76. The last issue is arguably the most concerning, because on one instance while he was not visually monitored in the seclusion room, T.Z. removed floor tiles and consumed the glue beneath the tiles, resulting in employees having to contact poison control. *Id.*, ¶ 69. Plaintiffs also claim that many of the seclusion reports the school district has provided are illegible or incomplete; and on information and belief, aver that the district has not provided a full set of accurate and complete reports documenting incidents of T.Z.'s seclusion under the district's policy. [DE 1, ¶¶ 87–88.]

Up to this point in time, P.Z. was in the dark about how her son was being treated at school. But that all changed on September 11, 2020, when T.Z. returned home from

school with "urine-soaked pants." The pants were soiled when T.Z. was placed in the

seclusion room after another student had urinated on the floor of the room. *Id.*, ¶¶ 77–78.

The report sent to T.Z.'s parents indicated T.Z. was "placed in the 'TO room,'" but made

no reference to its condition. *Id.*, ¶ 79. Later that day, P.Z. contacted Wea Elementary

about the incident and "demanded answers." *Id.*, ¶ 80. Vanderwal and Wilson (by then

the school's Principal) "insisted that the seclusion of T.Z. was appropriate," but Wilson

"refused" P.Z.'s request to view the "TO room." *Id.*, ¶¶ 80–81.

Three days after P.Z. contacted the school, on September 14, Vanderwal contacted

Child Protective Services to report that T.Z. had a "suspicious bruise on his face."

Vanderwal allegedly "insisted on sitting in on T.Z.'s interview with the CPS

caseworker." *Id.*, ¶ 82. Following the interview, the caseworker concluded the allegation

of abuse was "unsubstantiated." *Id.* P.Z. believes the report of abuse was an act of

retaliation for her earlier complaints about T.Z.'s improper seclusion. [DE 1, ¶ 83.]

Sometime later that week, P.Z., Wilson, and Vanderwal had a phone call, in which

Wilson and Vanderwal again defended T.Z.'s seclusion. P.Z. claims that Wilson told her

that the school could seclude T.Z. "if he was 'disruptive,'" and both Wilson and

Vanderwal used the terms "seclusion" and "time-out" interchangeably. *Id.*, ¶ 84.

Eventually, P.Z. came to learn how extensively seclusion was being used on T.Z.

Aside from the overuse of seclusion, T.Z. faced other problems at school. He was

subjected to "discrimination and mistreatment" by school officials on the basis of his

disability. Specifically, school employees forbid T.Z. from attending recess with other

students and from participating in "specials," like music, gym, and art classes, unless he "earned them;" from eating lunch in the lunchroom with other students; and from participating in extracurricular activities, while other students were not subjected to these conditions. *Id.*, ¶¶ 92–94. Like the improper seclusion of T.Z. and violations of various provisions in the Seclusion Plan, Plaintiffs claim that these "prohibitions operated to further punish T.Z. for his disability." *Id.*, ¶ 94.

After attempting to discuss the issues with Wilson and Vanderwal, P.Z. contacted Indiana Disability Services and filed a complaint with the Indiana Department of Education in January 2021. An administrative investigation is ongoing. [DE 1, ¶¶ 85, 89.] T.Z. has since enrolled at Woodland Elementary and is no longer in a self-contained emotional disability classroom. *Id.*, ¶ 86. Despite moving to a new school, T.Z. has displayed severe emotional and physical reactions as a result of Defendants' actions: he has "acted out at home," has nightmares, and his attachment behaviors and anxiety have also worsened as a result. *Id.*, ¶ 109.

## Discussion

Defendants seek judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), arguing that all of T.Z.'s claims must be dismissed because T.Z. failed to exhaust administrative remedies, they are entitled to qualified and statutory immunity, and the complaint fails to state a claim upon which relief may be granted. [*See* DE 25 at 7–8.] The Seventh Circuit has held that after the close of pleadings a defendant may raise various Rule 12(b) defenses in a motion for judgment on the pleadings under Rule 12(c).

*Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993). In this situation, I review Defendants' motion under the same standard for the corresponding Rule 12(b) motion to dismiss. *Id.*

Federal Rule of Civil Procedure 12(b)(6) permits a party to move for dismissal if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In evaluating a motion to dismiss brought under Rule 12(b)(6), I must accept the complaint's allegations as true and draw all reasonable inferences in the plaintiff's favor. *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, 19 F.4th 1002, 1006 (7th Cir. 2021). However, to avoid dismissal under Rule 12(b)(6), a claim for relief must be "plausible on its face." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.    <u>Individual Liability Under Title II of the ADA</u>

I'll start with the easy stuff. Defendants seek dismissal of T.Z.'s ADA retaliation claim against Vanderwal (Count 2) for failure to state a claim. [DE 25 at 14.] Plaintiff did not respond to this argument. [*See* DE 36.] The thrust of this claim is that Vanderwal and the school district itself violated the ADA by "lodging a CPS report in retaliation of [*sic*] P.Z.'s complaints regarding Vanderwal and the district's discrimination and mistreatment of T.Z." [DE 1, ¶ 130.] As the Seventh Circuit has explained, there is no individual liability under the ADA or Rehabilitation Act. *Stanek v. St. Charles Comm. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644–45 (7th Cir. 2015); *Doe v. Bd. of Trs. of Univ. of Ill.*, 429 F. Supp. 2d 930, 940 (N.D. Ill. 2006); *see also* 42 U.S.C. § 12131 *et seq.* Accordingly, the

ADA retaliation claim against Vanderwal individually will be dismissed for failure to state a claim.

## II.   Administrative Exhaustion Under the IDEA

The Individuals with Disabilities Education Act (IDEA) is a federal statute designed to assist disabled children with navigating the educational experience in public schools in the United States. Boiled to its essence, the IDEA offers federal funds to states in exchange for a commitment to provide a "free appropriate public education"— commonly shortened to "FAPE"—to all children with certain physical and intellectual disabilities. 20 U.S.C. §§ 1412(a)(1)(A), 1401(3)(A)(i). Under the Act, a student's IEP is the "primary vehicle" for providing the free appropriate education with the IEP being personalized to meet a child's educational needs, which documents the student's "levels of academic achievement," specifies "measurable annual goals" to "make process in the general education curriculum," and lists "special education and related services" the child needs to "advance appropriately toward [those] goals." 20 U.S.C. § 1414(d); *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IDEA sets out formal procedures for resolving disputes, 20 U.S.C. § 1415(b)(6), and includes an exhaustion requirement, *id.* § 1415(l).

Even though Plaintiffs do not assert a claim pursuant to the IDEA, Defendants argue that the IDEA exhaustion requirement applies nonetheless to Counts 1, 2, 3, 4, 5 and 14 of the Complaint. Count 1 is against Tippecanoe School Corporation for violation of the Rehabilitation Act; Count 2 is against Tippecanoe and Vanderwal for violation of the ADA; Counts 3 and 4 are against all Defendants for violation of T.Z.'s Fourteenth

Amendment substantive due process rights; Count 5 is against all Defendants for violation of T.Z.'s Fourteenth Amendment right to equal protection; and Count 14 is brought against Tippecanoe and GLASS under a *Monell* theory, based on an alleged unconstitutional policy regarding the use of seclusion. [DE 1, ¶¶ 110–54, 201–13.]

One might reasonably wonder how an exhaustion requirement in one federal statute (the IDEA) could apply to a claim brought under a totally different statute or constitutional provision. The answer can be found, in part, in *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), the seminal case on the IDEA exhaustion requirement.[1] In *Fry*, the Supreme Court considered a disabled child's discrimination claims stemming from the school's denial of a request to permit the child to have her service dog, a goldendoodle named Wonder, join her when she attended elementary school. Under the student's IEP, a human aide provided her with one-on-one support throughout the day, and school officials took the position that this made Wonder unnecessary in the classroom environment. *Id.* at 162. After an administrative ruling from the Department of Education, the family filed a civil action for money damages under the ADA and § 504 of the Rehabilitation Act for the denial of equal access to the school and its programs,

---

[1] Earlier this month, the Supreme Court heard argument in another case dealing with the interplay between the IDEA's exhaustion requirement and the ADA. *See* Tr. of Oral Argument, *Perez v. Sturgis Pub. Sch.*, No. 21-887 (Jan. 18, 2023), available at https://www.supremecourt.gov/ oral_arguments/argument_transcripts/2022/21-887_c07d.pdf. In that case, the Sixth Circuit held that a deaf student seeking damages under the ADA was nonetheless required to exhaust his administrative remedies under the IDEA before coming to federal court. *Perez v. Sturgis Pub. Sch.*, 3 F.4th 236, 241–42 (6th Cir. 2022). The Supreme Court granted certiorari to decide whether the IDEA's exhaustion requirement applies to ADA claims seeking money damages in a situation where the plaintiff is also seeking relief under the IDEA. *See* 143 S. Ct. 81 (2022). That case is beside the point for our purposes because T.Z. has not pursued a remedy under the IDEA.

refusing to accommodate her use of a service animal, and otherwise discriminating against her on the basis of her disability. *Id.* at 163–64.

Despite the fact the suit was not brought under the IDEA, it was nevertheless dismissed by the district court (and the dismissal affirmed on appeal) due to the plaintiff's failure to first exhaust the IDEA's administrative procedures. The key dispute, both at the district court and on appeal, was whether "the injuries [alleged] related to the specific substantive protections of the IDEA," which would require compliance with the Act's administrative procedures. 580 U.S. at 157, 163–64. The Court, taking the matter up "to address confusion in the Courts of Appeals as to the scope of [the IDEA's] exhaustion requirement," noted the relevant statutory language:

> Nothing in this chapter shall be construed to restrict or limit the rights procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq.*], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 790 *et seq.*], or other Federal laws protecting the rights of children with disabilities, *except that* before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l) (emphasis added); 580 U.S. at 164. Subsections (f) and (g) concern administrative proceedings before state and local educational agencies and related appeals.

As the Court put it, the "first half" of the exhaustion provision confirms that federal statutes like the ADA are "'separate vehicles,' no less integral than the IDEA, 'for ensuring the rights of handicapped children," and thus the Act "does not prevent a

plaintiff from asserting claims under such laws even if . . . those claims allege the denial

of an appropriate public education (much as an IDEA claim would)." 580 U.S. at 161

(citing H.R. Rep. No. 99–296, at 4, 6 (1985)). At the same time, "the second half of

§ 1415(l) (from 'except that' onward) imposes a limit on that 'anything goes' regime, in

the form of an exhaustion provision. According to that closing phrase, a plaintiff

bringing suit under the ADA, the Rehabilitation Act, or similar laws must in certain

circumstances—that is, when 'seeking relief that is also available under' the IDEA—first

exhaust the IDEA's administrative procedures." *Id.* In other words, no matter what the

plaintiff calls the count in question, if the substance of the plaintiff's claim really

concerns the denial of a FAPE guaranteed by the IDEA, then the plaintiff must first

comply with the administrative procedures unique to the Act. As the Court stated, the

label that a plaintiff places on his claims are of little value, because "[w]hat matters is

the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside

any attempts at artful pleading." *Id.* at 169. Therefore, my examination of the complaint

in this case "should consider substance, not surface." *Id.*

Additionally, the IDEA "protects only 'children' . . . and concerns only their

schooling," and its "goal is to provide each child with meaningful access to education

by offering individualized instruction and related services appropriate to her 'unique

need.'" *Id.* at 170 (citing 20 U.S.C. §§ 1401(29), 1412(a)(1)(A)). At the same time, the

Court noted that Title II of the ADA and § 504 of the Rehabilitation Act "cover people

with disabilities of all ages, and do so *both inside and outside schools*," and "aim to root

13

out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs." *Id.* (emphasis added). Thus, it is possible that the "same conduct might violate all three statutes," and a plaintiff may therefore seek relief from multiple statutes. *Id.*

In an effort to shed light on the inquiry, *Fry* offers two questions as a "clue" when it is hard to determine whether a claim is fundamentally about the denial of an education. 580 U.S. at 171. The two questions are: Could the plaintiff have brought "essentially the same claim" against a different kind of public facility, like a public theater or a library? And could an adult at the school, like an employee or a visitor, have "pressed essentially the same grievance"? *Id.* at 171–73. The Court paired these questions with a few hypothetical examples:

> Suppose first that a wheelchair-bound child sues his school for discrimination under Title II (again, without mentioning the denial of a FAPE) because the building lacks access ramps. In some sense, that architectural feature has educational consequences, and a different lawsuit might have alleged that it violates the IDEA: After all, if the child cannot get inside the school, he cannot receive instruction there; and if he must be carried inside, he may not achieve the sense of independence conducive to academic (or later to real-world) success. But is the denial of a FAPE really the gravamen of the plaintiff's Title II complaint? Consider that the child could file the same basic complaint if a municipal library or theater had no ramps. And similarly, an employee or visitor could bring a mostly identical complaint against the school. That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education. [. . .]
>
> But suppose next that a student with a learning disability sues his school under Title II for failing to provide remedial tutoring in mathematics. That suit, too, might be cast as one for disability-based

discrimination, grounded on the school's refusal to make a reasonable accommodation; the complaint might make no reference at all to a FAPE or an IEP. But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE, thus bringing § 1415(l) into play.

*Id.*

Ultimately, applying these standards, the Supreme Court remanded the case, and the district court subsequently denied summary judgment to defendants on the exhaustion defense, concluding that they had failed to meet their burden to establish that the "substance" of the plaintiff's claims asserted denial of a FAPE. *Fry v. Napoleon Comm. Sch.*, No. 12-15507, 2018 WL 4030757, at *14–16 (E.D. Mich. Aug. 23, 2018).

Let's be honest about it: the *Fry* standard is a bit mushy, and the hypothetical questions posed in the opinion are not exactly a comfortable fit in many cases. Nonetheless, Defendants urge me to answer "no" to both hypothetical questions set forth in *Fry*—whether T.Z. could have brought "essentially the same claim" if the conduct had occurred in a different public facility that was not a school, like a library or public theater, and whether an adult at the school, like an employee or visitor, could have pressed "essentially the same grievance" as T.Z. here. T.Z. presses the opposite view, citing as support the findings of the district court in *Fry* and various lower courts evaluating similar claims.

I'll start by stating the obvious: the challenged claims contain no specific allegations about the denial of a free an appropriate education. Indeed, unlike the child

15

in *Perez*, T.Z. has never made a claim under the IDEA. *See* 3 F.4th at 238–39. True, T.Z.'s IEP is the "primary vehicle" for ensuring he receives a FAPE, and he concedes that the IEP allowed his teachers to put him in "time-out." One could reasonably infer that improperly secluding T.Z. in the manner alleged would violate the terms of his IEP, and thus imperil his right to a free appropriate public education. It's also true, as the Defendants point out, that the complaint contains a stray allegation that the IEP, which stated that timeouts would last "for 5 minutes," itself violated the Seclusion Plan and applicable law. [DE 1, ¶ 63.] But reading the complaint as narrowly seeking redress for denial of a FAPE misses the forest for the trees.

According to T.Z.'s well pled allegations, which I must accept as true at this stage of the proceedings, "time out" under the IEP was not the same thing as "seclusion" under the district's policy. That was something the district, GLASS, and the school's staff knew or certainly should have known. It is also notable that T.Z. has moved to a new school in the district and does not seek to enforce or modify the terms of his IEP. As I read it, the true crux of the complaint is that the district, GLASS, and its employees violated T.Z.'s statutory and constitutional rights in three main ways: (1) by secluding T.Z. "for punishment and other improper purposes," in violation of the district's Seclusion Plan (notwithstanding any provision permitting the use of "time-out" in T.Z.'s IEP); (2) by failing to follow various requirements of the Seclusion Plan—like failing to use de-escalation techniques and other measures prior to seclusion, properly document each instance of seclusion, promptly contact T.Z.'s parents as soon as possible

16

with seclusion reports, notify the Indiana Department of Education regarding the number of seclusions taking place in the school district, and maintain direct continuous visual and auditory monitoring of T.Z. in the seclusion room; and (3) by limiting T.Z.'s access to activities and benefits enjoyed by other, non-disabled students, in violation of his rights under the ADA, § 504 of the Rehabilitation Act, and the Constitution. Thus, these claims center on disability discrimination, distinct from inadequate individualized educational services that could constitute denial of a FAPE.

Dreaming up analogies to T.Z.'s claims in a different public facility and involving adult plaintiffs strikes me as a curious exercise, but that's what the Supreme Court in *Fry* indicated I should do to evaluate the real "crux" of T.Z.'s claims. Here, the complaint focuses on a school's improper seclusion of a disabled student from a classroom as punishment and related disability discrimination in the school setting. Unlike the examples provided in *Fry*, I "cannot as easily divorce [T.Z.'s] claim of isolation from the context of him being an elementary student at the school." But it does not follow that the claims must be viewed as challenging the denial of a FAPE, as other courts have acknowledged in analogous circumstances. *See J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 986–87 (11th Cir. 2017) (holding that plaintiff's claims that he was regularly isolated from peers in a weight room and physically and verbally abused while isolated "could be brought as a FAPE violation" for failure to follow plaintiff's IEP, but were "also cognizable as a separate claim" for disability discrimination); *G.M. by & Through Mason v. Lincoln Cnty. Sch. Dist.*, No.

17

6:16-CV-01739-JR, 2017 WL 2804996, at *4 (D. Or. Apr. 21, 2017) ("[P]laintiff alleges he was secluded and punished in ways that non-disabled students were not. While such treatment could certainly affect the quality of one's education, the harm plaintiff describes could exist even if his education was top notch. . . . [T]hus his claims fall outside the IDEA.").

I am persuaded that a plaintiff in T.Z.'s position could bring essentially the same claims if the conduct occurred at a different public facility or if the plaintiff was an adult at the school. Let's suppose T.Z. was subjected to a policy of secluding disabled patrons of the local library or public pool. Suppose further the seclusion is in a barren, windowless closet for unreasonable or indeterminate periods of time, or he was forced into a closet under similar conditions by a librarian or a lifeguard in order to punish him or due to their frustration with his disability. He would surely be able to file a lawsuit against those public facilities or their employees. If a public theater prevented T.Z. from attending a concert, unlike non-disabled patrons, unless he "earned" admittance, it could be fairly said to discriminate on the basis of T.Z.'s disability. On the flip side (and although admittedly a bit fanciful), suppose a disabled adult visited the school, only to be detained in a closet and held there by staff because they found his disability disruptive. The school officials would plainly face legal scrutiny for their conduct.

What's more, the claims before me parallel the types of claims that *Fry* indicated are not subject to the administrative exhaustion requirement. For example, a claim that

a school created an unreasonable policy of secluding students with disabilities, or that

its employees repeatedly and intentionally violated such a policy by secluding a

disabled student in a barren, windowless closet for unreasonable or indeterminate

periods of time as punishment or due to their frustration, resembles the Court's

hypothetical in which a teacher, "acting out of animus or frustration, strikes a student

with a disability." In that situation, the "gravamen of the plaintiff's complaint," while

arising in the educational context, "does not concern the appropriateness of an

educational program." *Fry*, 580 U.S. at 172 n.9.

As noted by a district judge in Wisconsin, "[n]either the Supreme Court nor the

Court of Appeals for the Seventh Circuit has considered whether claims based on the

seizure or use of force against a student with an IEP . . . must be exhausted under the

IDEA." *Rabel v. New Glarus Sch. Dist.*, No. 20-CV-821-BBC, 2021 WL 808652, at *3 (W.D.

Wis. Mar. 2, 2021). But whether exhaustion under *Fry* is required for claims involving

the improper use of restraints or seclusion has been considered by a number of other

courts in an array of factual contexts. Most of those courts have held that the IDEA

exhaustion requirement is inapplicable in such a circumstance, and I find the reasoning

in those opinions persuasive. *See, e.g.*, *Houston Cnty. Bd. of Educ.*, 877 F.3d at 986–87;

*G.M.,* 2017 WL 2804996, at *3–5; *see also Rabel*, 2021 WL 808652, at *4 (holding that

"crux" of due process claims based on "repeated acts of excessive restraint, seclusion,

and physical force" did not concern denial of a FAPE, even though the complaint

"discuss[ed] N.R.'s IEP and defendant's inadequate response to N.R.'s disability"); *Doe*

*Child by Doe v. Stark Cnty. Cmty. Unit Sch. Dist. #100*, No. 19-1215-MMM, 2019 WL

6702538, at *2–3 (C.D. Ill. Dec. 9, 2019) (holding that gravamen of plaintiff's complaint

involving abuse by a bus aide, including physical restraint and placing a five-gallon

bucket over the upper half of the plaintiff's body, did not trigger exhaustion

requirement); *J.P. v. Williamson Cnty. Educ. Servs.*, No. 3:16-CV-879-NJR-DGW, 2018 WL

9651501, at *5 (S.D. Ill. Mar. 27, 2018) ("The 'gravamen' of the wrongful conduct alleged

in the Amended Complaint is not that it violated the IDEA or denied J.P. adequate

special education services, but that it involved harmful and discriminatory behavior by

school personnel (*i.e.* confining J.P. in a closet and using harmful armlock, wristlock,

and/or fingerlock techniques in order to physically restrain him)."); *accord Price as next*

*friend of J.K. v. Mueller-Owens*, 516 F. Supp. 3d 816, 825–26 (W.D. Wis. 2021) (holding that

gravamen of plaintiff's § 1983 claims arising from violent seizure and battery of

disabled sixth-grade student by district's positive behavior coach did not challenge

denial of a FAPE, and denying summary judgment on exhaustion defense) (collecting

cases).

Finally, I will note that the Sixth Circuit recently entered an opinion that offers a

helpful analysis of the text of the IDEA and circuit court decisions attempting to

faithfully apply *Fry. See Doe by K.M. v. Knox Cnty. Bd. of Educ.*, ___ F.4th ___, 2023 WL

33624 (6th Cir. Jan. 4, 2023). The case presented the question whether IDEA exhaustion

bars ADA and Rehabilitation Act claims stemming from a school's refusal to ban

students from eating food or chewing gum in academic classrooms. The minor plaintiff

suffered from misophonia, a condition that rendered her hypersensitive to everyday sounds like eating and chewing gum. Her parents sought a ban on eating and chewing in all of her classes to reduce the physical and emotional burden such sounds posed to their daughter. *Id.* at *1–2.

Judge Murphy, writing for the court, summarized the Court's decision in *Fry*. *Id.* at *4–5. I think he hit the nail on the head: "Although *Fry* directs [courts] to ask whether a complaint seeks a 'free appropriate public education' as the relief, *it did not offer much input into what this term of art means*." *Id.* at *5 (emphasis added) (internal citation omitted). I agree with that characterization. Nevertheless, based on a deeper dive into the text of the IDEA and available circuit precedents, the court was able to craft a clearer line of demarcation: a plaintiff only seeks denial of a FAPE, triggering exhaustion under *Fry*, "if a child needs an *instructional change*, not just a *non-instructional accommodation* to some school rule or policy." *Id.* (citing 20 U.S.C. § 1415(l)).

In support of this distinction, the court carefully considered the meaning of various terms of art contained in the IDEA—namely, FAPE and "special education and related services"—and distilled down circuit precedents trying to make sense of *Fry*. *Knox Cnty.*, 2023 WL 33624, at *5–6. On one hand, circuit decisions consistently hold that the IDEA "requires instructional changes" to trigger the exhaustion provision, *id.* at *6 (collecting cases), whereas, on the other hand, circuit courts have consistently held that parents "need not exhaust claims challenging noninstructional harms," such as when challenging "abuse that their child suffered in the classroom, . . . because the abuse had

21

nothing to do with the child's instruction," *id.* (citing *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 914 (9th Cir. 2020); *Doe v. Dallas Indep. Sch. Dist.*, 941 F.3d 224, 227–29 (5th Cir. 2019); *Houston Cnty. Bd. of Educ.*, 877 F.3d at 986–87). The court then observed that the requested ban on chewing and eating in Doe's classes resembled the accommodations that courts have consistently found fall outside the IDEA because they did not seek any instructional changes. 2023 WL 33624, at *8. Following this meatier analysis, the court also observed that *Fry*'s hypothetical questions "reinforce this conclusion" that the plaintiffs were not subject to the exhaustion requirement. *Id.* (citations omitted). While the facts of *Knox County* by no means provide an apples-to-apples comparator to the pattern of abuse T.Z. alleges occurred at Wea Elementary, I find persuasive the court's distinction between disputes involving instructional changes and those involving non-instructional accommodations. Here, the conduct challenged plainly centers on abuse suffered in the classroom that has only a superficial connection to his instruction in the special education classroom, reinforcing my conclusion that exhaustion under *Fry* is not required.

In sum, in light of the considerations elucidated in *Fry*, and because the crux of the complaint does not relate to the denial of a FAPE to T.Z., I conclude that Counts 1, 2, 3, 4, 5, and 14 should not be dismissed for failure to exhaust administrative remedies.

## III. Qualified Immunity

Defendants next argue that certain claims against them must be dismissed under the doctrine of qualified immunity. But before diving in, it is worth mentioning that

only rarely is qualified immunity appropriate at the pleadings stage. The Seventh Circuit has acknowledged that "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (citing *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000)). That is because "an immunity defense usually depends on the facts of the case," and it is well established that a "plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Id.*

The legal standards for qualified immunity are familiar ones. The issue hinges on two questions: whether the facts alleged "make out a deprivation of a constitutional right," and whether the plaintiff's rights were "clearly established" at the time the violation occurred. *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)). To "avoid '[u]nnecessary litigation of constitutional issues' and expending scarce judicial resources that ultimately do not impact the outcome of the case, [courts] may analyze the 'clearly established' prong without first considering whether the alleged constitutional right was violated." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)). I will take that approach here: first considering whether the asserted right is "clearly established," then evaluating whether the complaint "make[s] out" a deprivation of that right.

To demonstrate that a constitutional right was clearly established at the time of an alleged violation, a plaintiff "need not point to an identical case finding the alleged

violation unlawful." *Kemp*, 877 F.3d at 351 (internal quotation and citation omitted).

However, "existing precedent must have placed the statutory or constitutional question

*beyond debate.*" *Id.* (emphasis added). Supreme Court and Seventh Circuit decisions on

point are controlling. If no such precedent exists, I must expand my "survey to include

all relevant case[]law" to determine whether there is a "such a clear trend" that it can be

said "with fair assurance that the recognition of the right by a controlling precedent was

merely a question of time." *Jacobs*, 215 F.3d at 767 (quoting *Cleveland-Perdue v. Brutsche*,

881 F.2d 427, 431 (7th Cir. 1989)). Even in the absence of such authority, a plaintiff may

still be able to make out a violation of clearly established law by showing that the

defendants' conduct was "so egregious and unreasonable that . . . no reasonable

[official] could have thought he was acting lawfully." *Abbott v. Sangamon Cnty., Ill.*, 705

F.3d 706, 724 (7th Cir. 2013); *Jacobs*, 215 F.3d at 767 (noting there may be "rare cases"

where a violation is "patently obvious," and a plaintiff "may not be required to present

the court with any analogous cases").

T.Z. asserts that the relevant law in this case concerns: (1) a student's rights to be

free from unreasonable seizure and excessive force by public school officials in a school

setting; (2) a disabled student's right to be free from systematic restraint and seclusion

for behaviors for which non-disabled students were not equally punished under the

equal protection clause of the Fourteenth Amendment; and (3) a student's right to be

free from bodily restraint, unreasonable social isolation, physical confinement, and right

24

to freedom of movement in the school setting under the substantive due process clause of the Fourteenth Amendment. [DE 1, ¶¶ 133, 152–54, 156.] I'll take up each below.

### A.     The Fourth Amendment Claim

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Seizures accomplished by public officials through the use of excessive force violate this guarantee. *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009). Courts look to the totality of the circumstances under an objective standard of reasonableness to determine whether, in a given case, the forced used was excessive. *Marion v. City of Corydon*, 559 F.3d 700, 705 (7th Cir. 2009).

Defendants argue that the Seventh Circuit "has never addressed a case closely analogous to the case at hand," and "has never defined the bounds of what is reasonable in the school context." [DE 37 at 6–7.] It appears the Supreme Court has not "identified the appropriate standard for evaluating an unlawful seizure or excessive force claim by a student against a school official," *Price*, 516 F. Supp. 3d at 826, although it has "applied the Fourth Amendment's protection to searches of students in public schools," *id.* (citing *New Jersey v. T.L.O.*, 469 U.S. 325 (1985)). But, as various lower courts in this circuit have explained, the Seventh Circuit has interpreted the Fourth Amendment to prohibit seizures of students by public school officials under certain circumstances. *Medina as next friend for N.M. v. Izquierdo*, 594 F. Supp. 3d 1045, 1054 (N.D. Ill. 2022) (citing *City of Elgin*, 578 F.3d at 541; *Wallace by Wallace v. Batavia Sch. Dist.*

25

*101*, 68 F.3d 1010, 1014 (7th Cir. 1995)); *Price*, 516 F. Supp. 3d at 826–27 (citing *Wallace*, 68 F.3d at 1013–14); *see also Doe Child by Doe*, 2019 WL 6702538, at *5.

*Wallace*, a leading Seventh Circuit decision in this area, involved a teacher briefly holding a student's wrist and removing her from the classroom "to quell the disruption being caused" by the student's heated argument with another student. 68 F.3d at 1011–15. The court held that "in the context of a public school," a teacher who seizes a student violates the Fourth Amendment only "when the restriction of liberty is unreasonable under the circumstances then existing and apparent," and a teacher may take "reasonable action" to "maintain order and discipline." *Id.* at 1014. Several factors bear on whether a seizure was objectively reasonable, including "the school context, the student's age, size, and demeanor, [the] relationship between the need for force and the amount used, the extent of the student's injury, whether the student presented a safety concern and whether the student was actively resisting." *Price*, 516 F. Supp. 3d at 828 (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015); *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 184 (4th Cir. 2018)). The court does not consider subjective factors, like "what the teacher's intentions were or whether the student thought the teacher's conduct was 'out of bounds.'" *Id.* (quoting *Wallace*, 68 F.3d at 1013–14).

T.Z. does not point me to any controlling case law specifically extending this Fourth Amendment protection to the disturbing facts set forth in the complaint. He does, however, note a recent decision involving a strikingly similar set of allegations, *Doe v. Aberdeen School District*, 42 F.4th 883 (8th Cir. 2022). In *Aberdeen*, several disabled

26

students asserted claims under the Fourth and Fourteenth Amendments based on teachers picking up and carrying them out of the classroom and secluding them elsewhere in the school for extended periods. The events took place between 2014 and 2016 while the plaintiffs were in third and fourth grade. The plaintiffs were either taken to a "little room," measuring ten feet by ten feet in a different part of the school "for purposes ranging from a calm-down space to Title I instruction to tutoring," or they were placed in "an atrium adjacent to the classroom" walled off by "dividers" (referred to as the "calm-down corner"). *Id.* at 887–90.

The Eighth Circuit noted the Seventh Circuit's admonition in *Wallace* that "seizure of a public school student by a teacher must be evaluated in the context of the school environment, where restricting the liberty of students is a *sine qua non* of the educational process." *Aberdeen Sch. Dist.*, 42 F.4th at 890 (quoting *Wallace*, 68 F.3d at 1013–14). The court then held, in straightforward fashion, that "secluding A.A. in the little room and B.B. in the calm-down corner constituted seizures." *Id.* The court later concluded that the plaintiffs' rights were clearly established for purposes of qualified immunity. *Id.* at 892–93. The allegations in this case bear significant similarities to those deemed significant by the court in *Aberdeen*. A teacher and aides physically removed T.Z. from the classroom environment and placed him in the "barren, windowless" seclusion room, held the door shut so that he could not get out of the room, and prevented him from leaving the room for unreasonable periods of time unrelated to legitimate discipline.

27

In my view, T.Z.'s Fourth Amendment claim falls within the contours of the right to be free from unreasonable seizures acknowledged in *Wallace* and applied in *Price* and *Aberdeen*. Even if there were not sufficient doctrinal foundation for the right asserted, if one believes the complaint, the nature and extent of the restraints imposed in this case are "so egregious that no reasonable official could have thought that behaving in such a manner was in accordance with the law." *See Doe Child by Doe*, 2019 WL 6702538, at *5 (citing *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009)). I therefore find that T.Z. had a clearly established right to be free from seizures of his person by school officials that were unreasonable from an objective standpoint when he was allegedly placed in the "seclusion room" at Wea Elementary.

To determine whether a seizure is "reasonable" requires "close scrutiny of the factual circumstances under which the seizure allegedly took place." *Id.* (citing *Hilton v. Lincoln-Way High Sch.*, No. 97 C 3872, 1998 WL 26174, at *6 (N.D. Ill. Jan. 14, 1998) (citing *Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146 (7th Cir. 1997))). Of course, at this early stage in the case, I don't have a lot of facts to evaluate. That makes "close scrutiny" of the relevant context all the more challenging. As in *Doe Child by Doe*, the relevant question in this posture is "whether Plaintiff's allegations are sufficient to indicate that he was seized by [Defendants], and whether, under the circumstances presented, that seizure was objectively unreasonable." *Id.* (citing *Wallace*, 68 F.3d at 1014).

28

The factual allegations previously detailed, if accepted as true, indicate that these questions must be answered affirmatively as to Vanderwal, Achgill, and Parker, who are alleged to have repeatedly seized T.Z. by enclosing him in a barren closet with the window covered, and holding him in this "seclusion room" for extensive or indeterminate periods of time. During the period in question, T.Z. was merely six years old, weighed less than fifty pounds, and posed no physical threat to himself or others. Accepting Plaintiffs' well pled allegations, Defendants fail to establish that the restraints imposed upon T.Z. by Vanderwal, Achgill, and Parker were reasonably necessary to maintain order and discipline in the classroom from an objective standpoint. As in *Aberdeen*, this case does not involve "ordinary school timeout," but rather restrictions on a student's liberty that "significantly exceed[ed]" what a child typically would face in an educational setting, and which were divorced entirely from legitimate discipline. *See* 42 F.4th at 890 (internal citation omitted). Indeed, the acts were allegedly undertaken to punish T.Z. for his disabilities or because his teachers found them annoying or unmanageable.

It's a closer call whether the allegations, accepted as true, make out a predicate Fourth Amendment claim against the rest of the individual defendants who were not present when the seizures allegedly took place and did not personally restrain T.Z. Under § 1983, supervisors cannot be held liable under a respondeat superior theory for subordinates' violations of citizens' constitutional rights. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). However, a plaintiff may sue a supervisor who, with

29

"knowledge of a subordinate's conduct, approves of the conduct and the basis for it." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1182 (7th Cir. 1994) (citations omitted). The complaint asserts claims against various leaders in the district and at GLASS by stating that these individual either knew that Vanderwal, Achgill, and Parker were not "properly trained" on student seclusion, or, in the alternative, "knew that the aversive interventions were being carried out," but "took no action." [DE 1, ¶ 162.] These omissions allegedly reflect the defendants' deliberate indifference to violations of T.Z.'s rights, pursuant to a "policy, custom, or practice, which served to ratify the wrongful conduct." *Id.*

The body of the complaint lays out how these individuals served in key leadership positions with responsibility for supervising school employees on student seclusion and participated in meetings related to T.Z.'s IEP during the relevant period. Wilson, for his part, allegedly took part in discussions with P.Z. and Vanderwal and endorsed the view that Vanderwal's seclusion of T.Z. was appropriate under the Seclusion Plan. Nothing much is said about the specific actions taken by the other administrators, or how they contributed to the harm that befell T.Z. But that makes sense in context. T.Z.'s parents were allegedly unaware of the challenged conduct, and when P.Z. became aware of the problem, she promptly engaged with Vanderwal and Wilson. It stands to reason that T.Z.'s family would not have had more direct, concrete information about the other individual supervisors' actions when the alleged violations took place, precisely because Defendants' actions made it seem like there was nothing

unusual about T.Z.'s "time outs" at the school. The complaint sets forth sufficiently detailed allegations to suggest that these individuals, by dint of their roles in the school and access to and control over the conduct of special education teachers and aides at Wea Elementary, could plausibly have known about (or should have known about and deliberately ignored) the alleged pattern of discriminatory conduct.

That being said, I remain skeptical of the claims against individual supervisors who did not participate in a hands-on way with T.Z.'s serial confinement. The problem is the Defendants sought dismissal based on an immunity defense that "usually depends on the facts of the case," and T.Z. "is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Alvarado,* 267 F.3d at 651. So, dismissal of the Fourth Amendment claim as to this second group of individual defendants would be premature at this point, but could readily be in play at the summary judgment phase of the proceedings.

### B.      The Substantive Due Process Claim

T.Z.'s substantive due process claim can be disposed of quickly. There is no clearly established *substantive due process* right to be free from bodily restraint and unreasonable social isolation. This is because the Supreme Court "has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended." *Kernats*, 35 F.3d at 1182 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). "Where a particular Amendment provides an explicit textual source of constitutional protection

against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Thus, where a plaintiff pursues "coextensive" claims under § 1983 for violations of rights under the Fourth Amendment and the substantive due process clause of the Fourteenth Amendment, there is"no need for the district court to further analyze the case under the strictures of the Fourteenth Amendment." *Kernats*, 35 F.3d at 1182 (citing *Albright*, 510 U.S. at 309 (Stevens, J., dissenting)); *accord Wallace*, 68 F.3d at 1015 ("[W]e do not believe that the Fourteenth Amendment's Due Process Clause affords Wallace any greater protection than the Fourth Amendment from unwarranted discipline while in school.").

In this case, the alleged violations of constitutional rights arise from the same conduct, and it is clear that the core of the substantive due process rights asserted (liberty from bodily restraint and unreasonable social isolation) amount to a violation of T.Z.'s right to be free from unreasonable seizure under the Fourth Amendment. [*Compare* DE 1, ¶¶ 155–63, *with id.*, ¶¶ 131–44, 150–54.] Accordingly, I will follow the Seventh Circuit's lead in *Kernats* and *Wallace* and dismiss this claim. Because the due process claim will be dismissed as to all individual defendants, the parallel claim against Tippecanoe School Corporation and Glass (Count 4) [DE 1, ¶¶ 145–49] will also be dismissed.

32

### C.      The Equal Protection Claim

T.Z.'s equal protection claim against the individual defendants boils down to this: defendants "intentionally discriminated against [him] because of his disability," and non-disabled students "were not subjected to the same treatment as T.Z." [DE 1, ¶¶ 151–53.] As previously outlined, the complaint contains specific allegations laying out a pattern of discriminatory "treatment" by T.Z.'s teachers (directly) and the district and school administration (either through their indifference or with their endorsement) based on T.Z.'s disability. This treatment ranged from inappropriately picking T.Z. out for seclusion and holding him in a barren, windowless closet, to barring him from participating in extracurricular activities and recess, to preventing him from eating lunch with other students—unless he "earned" treatment equal to non-disabled students. All of these actions were allegedly undertaken over a period of years by T.Z.'s teachers and ratified or knowingly permitted by the supervisors within the school district, GLASS, and Wea Elementary. The complaint extensively details how T.Z. was seemingly picked out for punitive treatment because his "problem behaviors" were hard for his teachers to manage, put in a closet, and left there without direct visual monitoring for long or indeterminate periods of time in some instances. The allegations taken as a whole strongly suggest that T.Z. was punished for his disability, unlike other non-disabled students.

The Defendants' qualified immunity argument on the equal protection claim runs headlong into an initial problem: waiver. The Defendants' opening brief made

only a passing reference to the qualified immunity defense to the equal protection claim, and their memorandum certainly didn't provide any authority addressing the claim. Only in their reply brief did Defendants provide a page of legal arguments attempting to poke holes in various cases Plaintiffs cited in opposition to the motion for judgment on the pleadings. [DE 37 at 10.] The root of the issue seems to be that Defendants believe *all* of the Fourteenth Amendment claims rise and fall on the resolution of the Fourth Amendment claim. *Id.* at 10 n.6.

As the Seventh Circuit has held, "[i]t is well established. . . that 'skeletal' arguments may be properly treated as waived, . . . as may arguments made for the first time in reply briefs." *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (citing *United States v. Diaz*, 533 F.3d 574, 577 (7th Cir. 2008); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). The "underlying concern is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." *Id.* (citing *Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1035 (7th Cir. 1990)). Here, Defendants made a single reference to the equal protection count in their opening brief and outlined no specific legal basis, beyond the general notion of "qualified immunity," to kick this claim out of court. [DE 25 at 10.] Qualified immunity is an affirmative defense; the Court is not obligated to do Defendants' work for them. I agree with Plaintiffs that in this case, the argument presented is so "skeletal" as to be waived.

But even if I had to get to the substance of the argument, I would be inclined to deny the qualified immunity argument on the Equal Protection counts. Here's why: In

*Wallace*, *Graham v. Connor*, and *Washington v. Chicago Public Schools*—the three cases

Defendants cite for the position that students alleging deprivations of liberty at school

have "no greater rights" under the Fourteenth Amendment than under the Fourth

Amendment—courts declined to evaluate coextensive claims under the *substantive due*

*process* clause, because those claims fell more directly within the contours of rights

protected by the text of the Fourth Amendment. However, none of those cases involved

an equal protection claim, and none can be read to stand for the proposition that such

claims are foreclosed by coextensive Fourth Amendment claims. *See* 490 U.S. at 394–95;

68 F.3d at 1013–14; *Washington v. Chicago Pub. Sch.*, No. 08 C 6571, 2011 WL 1002859, at

*4–5 (N.D. Ill. Mar. 17, 2011).

T.Z., as a student with a disability, had a right to be free from government-

imposed distinctions on the basis of his disability that were not "rationally related to a

legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,

442 (1985); *see also, e.g., Bd. of Trs. of Univ. of Ill.*, 429 F. Supp. 2d at 943. That's what he

asserts happened at Wea Elementary—a pattern of conduct animated by his disability,

for no legitimate purpose related to the provision of public education.

*University of Illinois* involved an equal protection claim brought by a former

student with learning disabilities after university officials allegedly singled him out for

unfair treatment and academic requirements, leading to his dismissal from the school.

The court considered the defendants' qualified immunity challenge to the claim. 429 F.

Supp. 2d at 943–44. The court, evaluating whether the plaintiff's complaint stated a

35

plausible deprivation of the right to equal protection guaranteed under *City of Cleburne*, held: "Doe alleges that the defendants intentionally discriminated against him because of his learning disabilities, and that allegation is sufficient to state a claim for denial of equal protection." *Id.* The court then denied the defendants qualified immunity at the pleadings stage, finding that "the law has been clearly established since at least *City of Cleburne*, and even before that, that irrational discrimination based on a person's disability violates the Equal Protection Clause." *Id.*

So too here. Plaintiffs raised *City of Cleburne* and *University of Illinois* in response to Defendants' defense of qualified immunity. [*See* DE 36 at 43.] But curiously, Defendants ignored those relevant precedents in their reply brief hoping, I suppose, that I would just overlook them. But without any meaningful argument to the contrary, I will find that these two cases make T.Z.'s right to equal protection "clearly established." Thus, the individual defendants are not entitled to judgment on the pleadings on the equal protection claim under the doctrine of qualified immunity, at least not now.

Once again, it bears repeating that this dispute is at an early stage, and with the benefit of discovery Defendants may be able to make out a persuasive defense that actions taken with respect to T.Z. were rationally related to a legitimate purpose and not motivated by discriminatory animus based on T.Z.'s disability. For present purposes, however, the well pled allegations in the complaint survive Defendants' qualified immunity challenge as to the Equal Protection claim.

III.    **The State Law Claims and Indiana Statutory Immunity**

Defendants also seek dismissal of the state law claims asserted against them individually for intentional infliction of emotional distress, negligent infliction of emotional distress, battery, assault, negligence, and false imprisonment (Counts 8–13), as well as all of the claims asserted against the school district and GLASS (Counts 1, 2, 4, 5, and 7–14). They argue that various provisions of Indiana state law grant them immunity. [DE 1, ¶¶ 110–30, 145–54, 164–213; DE 25 at 12–13.] Defendants make four main arguments for why they are immune from suit on these counts, but none of them warrant dismissal of the claims on the pleadings.

A.    **Torts Outside the Scope of Employment**

First, Defendants argue that they are entitled to statutory immunity on the state law tort claims pursuant to Indiana Code § 34-13-3-5(b), which states that "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." That's all they had to say about it in their opening brief. [DE 25 at 12.] Plaintiffs respond that this argument is underdeveloped. In any case, Plaintiffs argue that it also misses the point: the complaint adequately pled "alternative allegations" that the individual defendants' conduct was outside the scope of their employment. [DE 36 at 47; *see* DE 1, ¶¶ 26–28.]

Defendants clarify the point they were trying to make, for the first time in reply, by citing to case law holding that acts are "within the scope of the employee's employment" when they are undertaken to further the employer's business, or when

37

they naturally or predictably arise from activities the employer has authorized employees to do on the job. [DE 37 at 11.] As Defendants tell it, "all of the alleged acts" they are accused of having undertaken personally were "of the same general nature as their authorized job duties," originated in activities "closely associated with the employment relationship," were to an appreciable extent for the purpose of furthering their employers' business, and naturally and predictably arose from the employees' job duties. *Id.* at 11–12. Whether or not Plaintiffs included adequate "alternative" allegations that the individual defendants did not act within the scope of their employment is of no moment, since the complaint should leave no doubt that what they were accused of doing to T.Z. fell "within the scope" of employment.

I will set aside Defendants' arguments improperly raised for the first time on reply. *See Hernandez*, 634 F.3d at 913 (citations omitted). Simply put, Defendants have not established that they are entitled to immunity under § 34-13-3-5(b). "Under the [Indiana Tort Claims Act], there is no remedy against the individual employee so long as he was acting within the scope of his employment." *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014); *see Bushong v. Williamson*, 790 N.E.2d 467, 472–73 (Ind. 2003). "To be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000). This is "generally a question for the factfinder." See *Twomey v. Land*, No. 2:19-CV-225-TLS-JPK, 2020 WL 6048138, at *7

(N.D. Ind. Oct. 13, 2020) (citing *Bushong*, 790 N.E.2d at 473 ("[W]hether the tortious act of an employee is within the scope of employment is a question of fact.")).

Rule 8(d)(2) of the Federal Rules of Civil Procedure permits a party to set out two or more statements of a claim or defense "alternatively or hypothetically," either in the same claim or defense or separately. Fed. R. Civ. P. 8(d)(2). If a party "makes alternative statements," then the pleading survives dismissal "if any one of them is sufficient." *Id.*; *see also Twomey*, 2020 WL 6048138, at *2, *6–7 (denying motion to dismiss under Ind. Code § 34-13-3-5 because plaintiff "alleged sufficient facts to state a claim in the alternative against the officers personally"). That is what Plaintiffs have done here. In short, the underlying question presented—whether the individual defendants were doing these things within the scope of their employment—is factually intensive and not ripe for resolution at the pleadings stage. I therefore decline to dismiss the claims pursuant to Indiana Code § 34-13-3-5(b).

### B.      "Restraint and Seclusion" Immunity

Next, Defendants argue that they are entitled to "restraint and seclusion immunity," pointing me to Indiana Code § 20-20-40-15. This provision states that "[t]his chapter may not be construed to give rise to a cause of action, either civil or criminal, against . . . a school corporation." Ind. Code § 20-20-40-15. The chapter in question—Title 20, Chapter 40—concerns student restraint and seclusion practices at state public schools. *See generally Id.* § 20-20-40 *et seq.* Section 11 establishes a state commission on seclusion and restraint in schools. Section 13 sets forth the duties of the

commission to adopt rules about the use of restraint and seclusion in school corporations and to develop a model plan for schools to follow (with specific features). Section 14 requires schools to adopt a restraint and seclusion plans that incorporate, "at a minimum, the elements of the model plan developed under section 13," and make them effective by July 1, 2014. *See* Ind. Code §§ 20-20-40-11, -13, -14.

Here, too, Defendants dispensed with the details. Their argument stridently cites the statutory text and claims (presumably based on its plain language) that the school district and GLASS "are entitled to immunity [under § 20-20-40-15]" on all the claims asserted against them. [DE 25 at 12–13.] Plaintiffs respond that the statute says that it does not "give rise to" a new private right of action, meaning that they cannot assert claims *pursuant to* this law. It does not follow that the state is immunized from all claims asserted under other laws simply because the underlying facts involve subject matter covered by Indiana Code § 20-20-40 *et seq.* This reading of the law is apparent on its face, Plaintiffs argue, because subsection (c) separately codifies qualified immunity for school personnel "with respect to an action taken to promote student conduct under a plan adopted under section 14 of this chapter if the action is taken in good faith and is reasonable." Ind. Code § 20-20-40-15(c).

More fundamentally, Plaintiffs have not sued for a violation of § 20-20-40 *et seq.*, and any references to violations of this law are included in the complaint simply for context. As the Plaintiffs' point out, even if the claims do not arise directly from these provisions, "Defendants' violation of the District's Seclusion Plan and Indiana laws

40

with respect to seclusion . . . are clearly relevant in assessing their conduct as it pertains" to their claims under federal statutes and state tort law. [DE 36 at 51.] Defendants, for the first time in their reply brief, argue that Plaintiffs' general allegations contain various references to violations of state law on seclusion, and specifically allege that the district's policy violated § 20-20-40-13. [DE 37 at 12.] I will set aside Defendants' arguments improperly raised for the first time on reply. *See Hernandez*, 634 F.3d at 913 (citations omitted). Tellingly, it appears that no court has applied § 20-20-40-15 to grant the state blanket immunity from suit under its own tort laws, let alone immunity from federal statutory and constitutional claims. Defendants have therefore failed to carry their burden to obtain dismissal on this ground.

### C.      Child Abuse Reporting Immunity

Vanderwal and Tippecanoe School Corporation assert that they enjoy "civil immunity" in defense of the retaliation claim against them under the ADA (Count 2). (Recall that the ADA retaliation claim was dismissed above against Vanderwal, since Plaintiffs cannot maintain suit against her personally under the ADA, *supra* at 9–10.) Indiana Code § 31-33-6-1(a) provides immunity to certain "person[s]" who report suspected child abuse or neglect "from any civil or criminal liability that might otherwise might be imposed . . . , even if the reported child abuse or neglect is classified by the department as unsubstantiated." The law includes an express carve-out for individuals who act maliciously or in bad faith. *Id.* § 31-33-6-2. It also includes a presumption that any person making a report covered under the law has "acted in good

faith." *Id.* § 31-33-6-3. Defendants' invocation of this statute raises a few questions, such as whether a "person" can encompass an entity like a school corporation, and what threshold is sufficient to plausibly allege a defendant's maliciousness or bad faith. The answers to these questions are not apparent from their opening brief, which dedicates a paragraph to citing the code section. [DE 25 at 13.]

A handful of federal courts have explored this immunity provision. According to the Seventh Circuit (albeit in an unpublished opinion), the law required Vanderwal and the school district to report a good-faith suspicion to the proper authorities if there was "reason to believe" T.Z. was suffering from abuse. *See Aylward v. Bamberg*, 182 F.3d 921 (Table), 1999 WL 515203, at *3–6 (7th Cir. 1999). The statute lays out a bright-line rule: defendants are immune from civil liability unless they have acted "maliciously or in bad faith." *Id.*; *see also, e.g.*, *Massenburg v. Richardson*, No. 3:09-CV-136 RM, 2011 WL 294843, at *4 (N.D. Ind. Jan. 25, 2011); *McCauley v. Lake Cnty. Dep't of Child Servs., Indiana*, No. 2:06-CV-412, 2008 WL 5333324, at *2 (N.D. Ind. Dec. 19, 2008) ("[I]mmunity is only destroyed if the plaintiff can demonstrate that the report was made maliciously or in bad faith.").

*McCauley* provides an example. That unfortunate case arose after a routine drug screen of the plaintiff's newborn son revealed positive results for narcotic drugs and the hospital notified the Department of Child Services of possible child abuse. Soon thereafter, the department removed the baby and his older sister from their parents' custody. It turned out that the lab's results were wrong. The plaintiff sued, claiming

that the hospital was negligent in making the initial report (both in administering the test and reporting the results to the department), and in failing to correct the error when it was discovered. 2008 WL 5333324, at *1–2. The hospital moved for summary judgment on plaintiffs' claims based in part on the immunity defense. The court granted immunity to the hospital on the claim that the hospital's initial report to the department was negligent, noting that the plaintiffs did not "allege outright" that the initial report was made maliciously or in bad faith. The context also did not suggest maliciousness or bad faith. While the report was made "before [the lab] results were confirmed," the timing alone did not meet plaintiffs' burden to show a dispute of material fact as to the hospital's bad faith. In that case, reporting the child abuse "right away" did not support an inference that the report was made maliciously, and there was no other evidence to rebut the statutory presumption of good faith. *Id.* at *2.

As in *McCauley*, I will accept that Tippecanoe School Corporation, like the hospital, is a covered "person" under the statute. In this case, the timing of the report is key to evaluating whether it was made in bad faith. But unlike in *McCauley*, the timing cuts against Defendants. The report came very close in time to P.Z. initially vocalizing concern about T.Z.'s treatment by his special education teachers and demanding answers from Vanderwal and the school's administrators. It's true that the ultimate finding that Vanderwal's report was unsubstantiated does not weigh against her per the terms of the statute; and it is true that Plaintiffs acknowledge in the complaint that T.Z. had a bruise at the time of the report. However, in my view, the complaint provides

43

sufficient context from which one could plausibly infer that the report was not made in good faith, and arguments to the contrary are better left for summary judgment.

Before moving on, it's worth noting that other federal courts in Indiana have questioned the propriety of applying Indiana Code § 31-33-6-1(a) "to extend federal absolute immunity provisions to good faith reporters of child abuse or neglect." *See Vanwinkle v. Nichols*, No. 115CV01082JMSMJD, 2015 WL 9275671, at *8 (S.D. Ind. Dec. 18, 2015) (rejecting application of state statutory immunity to federal claims under § 1983, because defendant failed to identify "any legal authority standing for the proposition that a state statute can provide immunity from a federal claim in any context, let alone in this context"); *Finnegan v. Myers*, No. 3:08-CV-503, 2015 WL 5252400, at *15 (N.D. Ind. Sept. 8, 2015) ("To the extent [defendant] relies on Indiana law to extend federal absolute immunity provisions to good faith reporters of child abuse or neglect, the Court is not convinced that there is a basis to do so[.]"). These decisions all appear to arise in the context of § 1983 claims. In *Finnegan*, Judge Lozano explained the Seventh Circuit's view that state law cannot immunize persons acting under the color of state law for conduct that is wrongful under § 1983. That's because "[a] construction of the federal statute which permitted a state immunity defense to have *controlling effect* would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced." 2015 WL 5252400, at *15 (emphasis added) (quoting *Hampton v. City of Chicago*, 484 F.2d 602, 607 (7th Cir. 1973)). The parties did not raise this issue, and I decline to apply it *sua sponte* to

Plaintiffs' ADA retaliation claim. But in light of the supremacy clause, I am dubious that a *state* immunity provision is able to bar a *federal* claim whether it be under § 1983 or the ADA.

In sum, for the reasons I have stated, the motion will be denied as to the defense of child abuse reporting immunity under the Indiana Code.

### D.      Discretionary Function Immunity

The fourth and final bundle of immunity arguments concerns "discretionary function" immunity conferred to governmental entities under the Indiana Tort Claims Act (ITCA). Ind. Code § 34-13-3-3(a)(7). The relevant provision states that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he performance of a discretionary function." *Id.*; *Bushong*, 790 N.E.2d at 472 (explaining that the ITCA "governs lawsuits against political subdivisions and their employees" and "provides substantial immunity for conduct within the scope of the employee's employment"). "This type of immunity shields certain policy decisions which cannot be assessed by tort standards." *Jurich v. Indiana Dep't of Transp.*, 126 N.E.3d 846, 855 (Ind. Ct. App. 2019) (quoting *Lee by & through Estes v. Bartholomew Consol. Sch. Corp.*, 75 N.E.3d 518, 526 (Ind. Ct. App. 2017)).

To determine whether an act is discretionary, Indiana courts apply a "planning-operational test," under which "planning functions are discretionary and thus shielded by immunity, whereas operational functions are not." *Id.* (citing *Peavler v. Bd. of Comm'rs of Monroe Cnty.*, 528 N.E.2d 40, 42 (Ind. 1988); *Lee*, 75 N.E.3d at 526). Ultimately, the

45

governmental entity bears the burden to prove that a challenged act or omission "was a policy decision made by consciously balancing risks and benefits." *Peavler*, 528 N.E.2d at 46 (collecting cases). As one court has succinctly explained:

> This assessment requires close consideration of the nature of the governmental actions and the decision-making process that was involved. . . . Planning activities include acts or omissions in the exercise of a legislative, judicial, or executive or planning function which involves formulation of basic policy decisions characterized by official judgment or discretion in weighing alternatives and choosing public policy. . . . The ultimate consideration is whether the action is one that was intended to be immune, and the court should look to the purposes of immunity to determine whether those purposes would be furthered by extending immunity to the act in question.

*City of Beech Grove v. Beloat*, 50 N.E.3d 135, 138 (Ind. 2016) (cleaned up).

Defendants argue that the ITCA bars Plaintiffs' claims against the school district and GLASS, "to the extent Plaintiffs allege negligent training and/or negligent supervision." [DE 25 at 13.] While courts have suggested that "[a]ny state law claims" based on "negligent training, supervision, and/or discipline" are barred by discretionary function immunity, Indiana law is clear that the planning-operational test applies to such claims and should be evaluated on a case-by-case basis in light of the foregoing considerations. *See Mwangangi v. Nielsen*, 525 F. Supp. 3d 869, 922 (S.D. Ind.), *decision clarified on reconsideration*, 536 F. Supp. 3d 371 (S.D. Ind. 2021), *aff'd in part relevant part*, 48 F.4th 816 (7th Cir. 2022); *Hooper v. Lain*, No. 2:14-CV-358-JVB, 2015 WL 1942791, at *5 (N.D. Ind. Apr. 29, 2015); *Coleman v. Curry*, No. 1:11-CV-01256-TWP, 2013 WL 5232196, at *9 (S.D. Ind. Sept. 16, 2013).

In moving on this defense, again, Defendants essentially cited the relevant code provision and asked the Court to connect the dots. [DE 25 at 13.] Defendants have the burden to establish the immunity defense under applicable law. The law is clear that Defendants must establish that a challenged act or omission "was a policy decision made by consciously balancing risks and benefits," rather than an operational function. *Peavler*, 528 N.E.2d at 46. With the benefit of additional facts in the record, it may be that Defendants can establish that they acted within the scope of their discretionary functions, and are thus immune from suit; but that is not clear from the face of T.Z.'s well pled allegations. On the record presented, I conclude Defendants have failed to meet their burden to obtain discretionary function immunity on Plaintiffs' claims.

## Conclusion

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings [DE 24] is **GRANTED IN PART** and **DENIED IN PART**, as follows:

Plaintiffs' claim against Vanderwal for violation of Title II of the Americans with Disabilities Act (Count 2) is **DISMISSED WITH PREJUDICE**, for failure to state a claim. Plaintiffs' claims under 42 U.S.C. § 1983 for denial of substantive due process (Counts 3, 4) are **DISMISSED WITHOUT PREJUDICE**. In all other respects, the motion is **DENIED**.

 **SO ORDERED.**

ENTERED: January 25, 2023.  /s/ Philip P. Simon   
           PHILIP P. SIMON, JUDGE
           UNITED STATES DISTRICT COURT